**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NATALIE MONNINGER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MERCADIEN P.C., CPAS, and ORRSTOWN BANK.<br><br>Defendants. | **Case No.:**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Natalie Monninger ("Plaintiff"), individually and on behalf of all others similarly situated, through the undersigned counsel, hereby alleges the following against Defendants Mercadien P.C., CPAs ("Mercadien") and Orrstown Bank ("Orrstown", collectively "Defendants"). Facts pertaining to Plaintiff and her personal experiences and circumstances are alleged based upon personal knowledge and all other facts herein are alleged based upon information and belief, *inter alia*, the investigation of Plaintiff's counsel.

## <u>NATURE OF THE ACTION</u>

1. This is a class action for damages with respect to Mercadien for its failure to exercise reasonable care in securing and safeguarding its clients' sensitive information—including names, dates of birth, addresses, Social Security Numbers or individual Tax Identification Numbers, account numbers, and government identification numbers such as driver license numbers or passport numbers (the "PII" or "Private Information").

2. This class action is brought on behalf of customers who had their PII stolen by unauthorized third parties because of a lapse in the security of Mercadien's computer network, which occurred, on information and belief, between September 17, 2025 and October 9, 2025 (the "Data Breach").

3. Orrstown Bank is a financial institution that offers personal banking, mortgage lending, business banking, wealth management, and similar financial services to consumers. Mercadien is an accounting firm that offers professional financial services to businesses and financial institutions. Orrstown contracts with Mercadien for such services.

4. Plaintiff was not notified of the Data Breach until late June of 2026, approximately eight months after her information was first accessed.

5. As a result of the Data Breach, Plaintiff and Class members will experience various types of misuse of their PII in the coming years, including but not limited to unauthorized credit card charges, unauthorized access to email accounts, and other fraudulent use of their financial information.

6. There has been no assurance offered from Defendants that all personal data or copies of data have been recovered or destroyed. Defendants offered twenty-four months of Experian credit monitoring, which does not guarantee the security of Plaintiff's information.

7. Accordingly, Plaintiff asserts claims for negligence, breach of contract, breach of implied contract, breach of fiduciary duty, unjust enrichment, violations of the Pennsylvania consumer protection statute, and declaratory and injunctive relief.

## PARTIES

**A. Plaintiff Natalie Monninger**

8. Plaintiff Natalie Monninger is a resident of Greencastle, Pennsylvania, and brings this action in her individual capacity and on behalf of all others similarly situated. Plaintiff Monninger maintains a checking account with Defendant Orrstown. Plaintiff Monninger was required to provide detailed personal and financial information to Orrstown in order to do business with the company. In maintaining Plaintiff Monninger's information, Defendants expressly and impliedly promised to safeguard her PII. Defendants, however, did not take proper care of Plaintiff's PII, leading to its exposure as a direct result of Defendants' inadequate security measures. In June of 2026, Plaintiff Monninger received a notification letter from Defendants stating that her PII was compromised.

9. The letter also offered two years of credit monitoring through Experian, which was and continues to be ineffective for Plaintiff Monninger and the Class members. In order to receive the free credit monitoring services, Plaintiff Monninger would have had to share additional sensitive private information with third parties connected to Defendants.

10. In the months and years following the Data Breach, Plaintiff Monninger and Class members will experience a slew of harms as a result of Defendant's ineffective data security measures. Some of these harms will include fraudulent charges, requests for services taken out in customers' names, and targeted advertising without consent.

11. These harms are not just theoretical. Plaintiff Monninger has already spent substantial time monitoring her credit accounts and attempting to learn more about the scope of the Data Breach.

12. Plaintiff Monninger greatly values her privacy, especially in the administration of her finances, and would not have done business with Defendants if she had known that her information would be maintained using inadequate data security systems.

**B. Defendant Mercadien P.C., CPAs**

13. Defendant Mercadien P.C., CPAs is a professional financial services corporation headquartered in Princeton, New Jersey. They offer a number of auditing, tax, and risk management services to businesses, non-profits, and individuals. Mercadien's corporate policies and practices, including those used for data privacy, are established in, and emanate from the state of New Jersey.

**C. Defendant Orrstown Bank**

14. Defendant Orrstown Bank is a financial institution headquartered in Harrisburg, Pennsylvania.

**JURISDICTION AND VENUE**

15. The Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2) ("CAFA"), because (a) there are 100 or more class members, (b) at least one Class member is a citizen of a state that is diverse from Defendants' citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

16. The Court has personal jurisdiction over Defendant Mercadien P.C., CPAs, because Mercadien's principal place of business is located in this District.

17. The Court has personal jurisdiction over Defendant Orrstown Bank because Orrstown Bank has established sufficient minimum contacts with this jurisdiction, including contracting with Mercadien P.C., CPAs and allowing the PII of its clients to be stored in this District.

18. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Defendant Mercadien P.C., CPAs maintains its principal place of business in this District and therefore resides in this District pursuant to 28 U.S.C. § 1391(c)(2). A substantial part of the events or omissions giving rise to the Class's claims also occurred in this District.

## FACTS

19. Defendant Orrstown Bank provides financial and banking services to thousands of clients throughout Pennsylvania and Maryland. As part of its business, Defendants were entrusted with, and obligated to safeguard and protect the Private Information of Plaintiff and the Class in accordance with all applicable law.

20. Orrstown Bank was informed of the Data Breach suffered by Mercadien and sent notice to impacted clients in late June of 2026. Orrstown sent a standard, templated notice letter to impacted parties, including Plaintiff.

21. Upon learning of the Data Breach, Mercadien investigated. Although Mercadien has not provided an estimate of how many customers were affected by the Data Breach, the incident appears to have impacted clients of multiple financial institutions.

22. Defendants offered no explanation for the delay between the initial discovery of the Breach and the belated notification to affected customers, which resulted in Plaintiff and Class members suffering harm they otherwise could have avoided had a timely disclosure been made.

23. Orrstown Bank's notice of Data Breach was not just untimely but woefully deficient, failing to provide basic details, including but not limited to, how unauthorized parties accessed Mercadien's networks, whether the information was encrypted or otherwise protected, how it learned of the Data Breach, whether the breach occurred system-wide, whether servers storing information were accessed, and how many customers were affected by the Data Breach.

Even worse, Defendants offered only two years of identity monitoring for Plaintiff and Class members, which required their disclosure of additional PII with which Defendants had just demonstrated they could not be trusted.

24. Plaintiff and Class members' PII is likely for sale to criminals on the dark web, meaning that unauthorized parties have accessed and viewed Plaintiff's and Class members' unencrypted, unredacted information, including names, addresses, Social Security numbers, and driver's license numbers.

25. The Breach occurred because Defendants failed to take reasonable measures to protect the Private Information they collected and stored. Among other things, Defendants failed to implement data security measures designed to prevent this release of information, despite repeated warnings to financial companies about the risk of cyberattacks and the highly publicized occurrence of many similar attacks in the recent past.

26. Defendants disregarded the rights of Plaintiff and Class members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiff and Class members' PII was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiff and Class members was compromised through unauthorized access. Plaintiff and Class members have a continuing interest in ensuring that their information is and remains safe.

## A. Defendants Failed to Maintain Reasonable and Adequate Security Measures to Safeguard Customers' Private Information

27. Defendants acquire, collect, and store a massive amount of customers' protected PII, including financial information and other personally identifiable data.

28. As a condition of engaging in financial services with Orrstown, Orrstown requires that these customers entrust them with highly confidential Private Information which is then shared with Mercadien.

29. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class members' Private Information from disclosure.

30. Defendants had obligations created by industry standards, common law, and representations made to Plaintiff and Class members, to keep the Private Information confidential and to protect it from unauthorized access and disclosure.

31. Defendants failed to properly safeguard Class members' Private Information, allowing hackers to access their Private Information.

32. Plaintiff and Class members provided their Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants and any of their affiliates would comply with their obligation to keep such information confidential and secure from unauthorized access.

33. Prior to and during the Data Breach, Defendants promised customers that their Private Information would be kept confidential.

34. Defendant's failure to provide adequate security measures to safeguard customers' Private Information is especially egregious because Defendants operate in a field which has

recently been a frequent target of scammers attempting to fraudulently gain access to customers' highly confidential Private Information.

35. In fact, Defendants have been on notice for years that Plaintiff's and Class members' PII was a target for malicious actors. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate security measures to protect Plaintiff's and Class members' PII from unauthorized access Defendants should have anticipated and guarded against.

36. Defendants were also on notice that the federal government has been concerned about data security. In 2021, the FTC updated its consumer information Safeguards Rule, requiring non-banking financial institutions such as mortgage brokers, motor vehicle dealers, and payday lenders, to develop, implement, and maintain comprehensive security systems to keep their customer's information safe. Against the backdrop of a rapid increase in cybersecurity incidents related to consumer financial information, Samuel Levine, the director of the FTC's Bureau of Consumer Protection stated that "Financial institutions and other entities that collect sensitive consumer data have a responsibility to protect it."[1]

37. The number of US data breaches surpassed 1,000 in 2016, a record high and a forty percent increase in the number of data breaches from the previous year.[2] In 2017, a new record high of 1,579 breaches were reported—representing a 44.7 percent increase.[3] That trend

---

[1] *FTC Strengthens Security Safeguards for Consumer Financial Information Following Widespread Data Breaches*, https://www.ftc.gov/news-events/news/press-releases/2021/10/ftc-strengthens-security-safeguards-consumer-financial-information-following-widespread-data

[2] Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout* (Jan. 19, 2017), https://www.idtheftcenter.org/surveys-studys.

[3] Identity Theft Resource Center, *2017 Annual Data Breach Year-End Review*, https://www.idtheftcenter.org/2017-data-breaches/.

continues. The First American Financial Mortgage data breach incident in 2019, for example, exposed hundreds of millions of users' financial information to cybercriminals.[4]

38. The average time to identify and contain a data breach is 287 days,[5] with some breaches going unrecognized for months leading to costly recovery efforts and financial impact. Additionally, the median cost per US consumer incurred on each fraud-related data breach incident in 2020 was $450.[6] Data breaches and identity theft have a crippling effect on individuals and detrimental impact on the economy as a whole.[7]

39. A 2021 study conducted by Verizon showed that internal mismanagement of data security, including mis-delivery of emails, represents nearly 44 percent of the data breaches in the financial sector.[8] The majority of these incidents involve the sending or releasing of information to unauthorized actors.[9]

40. Almost half of the data breaches globally are caused by internal errors, either human mismanagement of sensitive information, or system errors.[10] Cybersecurity firm Proofpoint reports that since 2020, there has been an increase of internal threats through the misuse of security credentials or the negligent release of sensitive information.[11] To mitigate these threats, Proofpoint recommends that firms take the time to train their employees about the risks of such errors.[12]

---

[4] *First American Financial Breach Exposes Millions of Complete Identities*, IDENTITY THEFT RESOURCE CTR (MAY 28, 2019), https://www.idtheftcenter.org/post/first-american-financial-breach-exposes-millions-of-complete-identities/.

[5] IBM SECURITY, COST OF A DATA BREACH REPORT 6 (2021) [hereinafter COST OF A DATA BREACH REPORT]

[6] Insurance Information Institute, *Facts + Statistics: Identity Theft and Cybercrime* (2020), https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#top

[7] *Id.*

[8] *Financial and Insurance Data Breaches*, VERIZON 2021 DIBR DATA BREACH SURVEY (2021), https://www.verizon.com/business/resources/reports/dbir/2021/data-breach-statistics-by-industry/financial-services-data-breaches/.

[9] *Id.*

[10] COST OF A DATA BREACH REPORT, *supra* note 8, at 30.

[11] *The Human Factor 2021*, PROOFPOINT (July 27, 2021), https://www.proofpoint.com/sites/default/files/threat-reports/pfpt-us-tr-human-factor-report.pdf.

[12] *Id.*

41. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precaution for protection."[13]

42. To prevent and detect unauthorized access, including the systems changes that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege; no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

[13] *See How to Protect Your Networks from RANSOMWARE*, FBI (2016) https ://www. fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

43. To prevent and detect unauthorized access to its systems, including the unauthorized access that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- **Update and patch your computer.** Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks . . .

- **Use caution with links and when entering website addresses.** Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net) . . .

- **Open email attachments with caution.** Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe.** Check a website's security to ensure the information you submit is encrypted before you provide it . . .

- **Verify email senders.** If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself.** Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs.** Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic . . .[14]

44. To prevent the unauthorized access that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**
  - Apply the latest security updates
  - Use threat and vulnerability management
  - Perform regular audit; remove privilege credentials;
- **Thoroughly investigate and remediate alerts**
  - Prioritize and treat commodity malware infections as potential full compromise

[14] *See Security Tip (ST19-001) Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY (Apr. 11, 2019), https://us-cert.cisa.gov/ncas/tips/ST19-001.

- **Include IT Pros in security discussions**
  - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

- **Build credential hygiene**
  - use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**
  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events

- **Harden infrastructure**
  - Use Windows Defender Firewall
  - Enable tamper protection
  - Enable cloud-delivered protection
  - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[15]

45. These are basic, common-sense email security measures that every business, not only those who handle sensitive financial information, should be doing. Defendants, with their heightened standard of care should be doing even more. But by adequately taking these common-sense solutions, Defendants could have prevented this Data Breach from occurring.

46. Charged with handling sensitive PII including financial information, Defendants knew, or should have known, the importance of safeguarding its customers' Private Information that was entrusted to it and of the foreseeable consequences if its data security systems were

[15] *See Human-operated ransomware attacks: A preventable disaster*, MICROSOFT (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-apreventable-disaster/.

breached. This includes the significant costs that would be imposed on Defendants' customers as a result of a breach. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

47. With respect to training, Defendants specifically failed to:

- Implement a variety of anti-ransomware training tools, in combination, such as computer-based training, classroom training, monthly newsletters, posters, login alerts, email alerts, and team-based discussions;
- Perform regular training at defined intervals such as bi-annual training and/or monthly security updates; and
- Craft and tailor different approaches to different employees based on their base knowledge about technology and cybersecurity.

48. The PII was also maintained on Defendants' computer systems in a condition vulnerable to cyberattacks such as through the infiltration of Defendant's negligently maintained systems. The mechanism of the unauthorized access and the potential for improper disclosure of Plaintiff's and Class members' PII was a known risk to Defendants, and thus Defendants were on notice that failing to take reasonable steps necessary to secure the PII from those risks left the PII in a vulnerable position.

### B. The Monetary Value of Privacy Protections and Private Information

49. The fact that Plaintiff's and Class members' Private Information was stolen—and is likely presently offered for sale to cyber criminals—demonstrates the monetary value of the Private Information.

50. At all relevant times, Defendants were well aware that Private Information they collected from Plaintiff and Class members is highly sensitive and of significant property value to those who would use it for wrongful purposes.

51. Private Information is a valuable property right that is an important commodity to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identity theft and financial fraud.[16] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII including sensitive financial information on multiple underground Internet websites, commonly referred to as the dark web.

52. At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[17]

53. Commissioner Swindle's 2001 remarks are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 Billion per year online advertising industry in the United States.[18]

54. The FTC has also recognized that consumer data is a new (and valuable) form of currency. In an FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[19]

---

[16] Federal Trade Commission, *Warning Signs of Identity Theft* (Sept. 2018), https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft .

17 *Public Workshop: The Information Marketplace: Merging and Exchanging Consumer Data*, FED. TRADE COMM'N Tr. at 8:2-8 (Mar. 13, 2001), https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

[18] *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*, The Wall Street Journal (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529 [hereinafter *Web's New Hot Commodity*].

[19] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, FED. TRADE COMM'N (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

55. Recognizing the high value that consumers place on their Private Information, many companies now offer consumers an opportunity to sell this information.[20] The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information. And, by making the transaction transparent, consumers will make a profit from their Private Information. This business has created a new market for the sale and purchase of this valuable data.

56. Consumers place a high value not only on their Private Information, but also on the privacy of that data. Researchers have begun to shed light on how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349.[21]

57. The value of Plaintiff's and Class members' Private Information on the black market is substantial. Sensitive financial information can sell for as much as $1000.[22] This information is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's information.

58. The ramifications of Defendants' failure to keep its customers' Private Information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for six to 12 months or even longer.

---

20 *Web's Hot New Commodity*, *supra* note 17.
21 *See* U.S. Dep't of Justice, *Victims of Identity Theft,* OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS 1 (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf [hereinafter *Victims of Identity Theft*].
22 *See* Zachary Ignoffo, *Dark Web Price Index 2021*, PRIVACY AFFAIRS (Nov. 21, 2021), https://www.privacyaffairs.com/dark-web-price-index-2021/

59. Approximately 21% of victims do not realize their identity has been compromised until more than two years after it has happened.[23] This gives thieves ample time to make fraudulent charges under the victim's name.

60. At all relevant times, Defendants were well-aware, or reasonably should have been aware, that the Private Information it maintains is highly sensitive and could be used for wrongful purposes by third parties, such as identity theft and fraud. Defendants should have particularly been aware of these risks given the significant number of data breaches affecting the financial industry and related industries.

61. Had Defendants remedied the deficiencies in their security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendants would have prevented the ransomware attack into its systems and, ultimately, the theft of its customers' Private Information.

62. The compromised Private Information in the Data Breach is of great value to hackers and thieves and can be used in a variety of ways. Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and thieves. Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[24] For example, different PII elements from various sources may be able to be linked in order to

[23] *See Medical ID Theft Checklist*, IDENTITYFORCE https://www.identityforce.com/blog/medical-id-theft-checklist-2.

[24] *Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, Preliminary FTC Staff Report*, FED. TRADE COMM'N 35-38 (Dec. 2010), https://www.ftc.gov/reports/preliminary-ftc-staff-report-protecting-consumer-privacy-era-rapid-change-proposed-framework.

identify an individual, or access additional information about or relating to the individual.[25] Based upon information and belief, the unauthorized parties utilized the Private Information they obtained through the Data Breach to obtain additional information from Plaintiff and Class members that was misused.

63. In addition, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

64. Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts. Thus, even if payment card information were not involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class members' Private Information to access accounts, including, but not limited to email accounts and financial accounts, to engage in the fraudulent activity identified by Plaintiff.

65. Given these facts, any company that transacts business with customers and then compromises the privacy of customers' Private Information has thus deprived customers of the full monetary value of their transaction with the company.

66. Acknowledging the damage to Plaintiff and Class members, Defendants instructed customers like Plaintiff to "review[] your account statements and credit reports for any unauthorized activity." Plaintiff and the other Class members now face a greater risk of identity theft.

---

[25] *See id.* (evaluating privacy framework for entities collecting or using consumer data with can be "reasonably linked to a specific consumer, computer, or other device").

67. In short, the Private Information exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breaches can be used in a variety of unlawful manners, including opening new credit and financial accounts in users' names. Plaintiff and Class members have a property interest in their information and were deprived of this property when it was released to unauthorized actors through the negligent maintenance of Defendant's systems.

**C. Defendants Failed to Comply with FTC Guidelines**

68. Defendants were prohibited by the Federal Trade Commission Act ("FTC Act") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

69. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[26]

70. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses.[27] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks;

---

[26] *Start With Security: A Guide for Business*, FED. TRADE. COMM'N (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf [hereinafter *Start with Security*].

[27] *Protecting Personal Information: A Guide for Business*, FED. TRADE. COMM'N (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf- 0136_proteting-personal-information.pdf.

understand their network's vulnerabilities; and implement policies to correct any security problems.

71. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[28]

72. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

73. Defendants were at all times fully aware of its obligation to protect the Private Information of customers because of its position as a trusted mortgage lender. Defendants was also aware of the significant repercussions that would result from its failure to do so.

**D. Damages to Plaintiff and the Class**

74. Plaintiff and the Class have been damaged by the compromise of their Private Information in the Data Breach.

75. The ramifications of Defendants' failure to keep customers' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that

[28] *Start With Security: A Guide for Business*, FED. TRADE. COMM'N (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf [hereinafter Start with Security].

information and damage to the victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.[29]

76. In addition to obligations under state laws and regulations, Defendants owed a common law duty to Plaintiff and Class members to protect Private Information entrusted to it, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties.

77. Defendants further owed and breached their duty to Plaintiff and Class members to implement processes and specifications that would detect a breach of their security systems in a timely manner and to timely act upon warnings and alerts, including those generated by their own security systems.

78. As a direct result of Defendant's intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize, and/or otherwise cause the identity theft and misuse to Plaintiff's and Class members' Private Information as detailed above, and Plaintiff and Class members are now at a heightened and increased risk of identity theft and fraud.

79. The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or denied loans for education, housing or cars because of

---

[29] *2014 LexisNexis True Cost of Fraud Study*, LEXISNEXIS (Aug. 2014), https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf.

negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

80. Some of the risks associated with the loss of personal information have already manifested themselves in Plaintiff's case. Plaintiff Monninger received a cryptically written notice letter from Defendants stating that her information was released, and that she should remain vigilant of fraudulent activity on her accounts, with no other explanation of where this information could have gone, or who might have access to it.

81. Plaintiff and the Class have suffered or face a substantial risk of suffering out-of-pocket losses such as fraudulent charges on online accounts, credit card fraud, loans opened in their names, and similar identity theft.

82. Plaintiff and Class members have, may have, and/or will have incurred out of pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

83. Plaintiff and Class members did not receive the full benefit of the bargain, and instead received services that were of a diminished value to that described in their agreements with Defendants. They were damaged in an amount at least equal to the difference in the value of the services with data security protection they paid for and the services they received.

84. Plaintiff and Class members would not have obtained services from Defendants had Defendants told them that it failed to properly train their employees, lacked safety controls over their computer network, and did not have proper data security practices to safeguard their Private Information from theft.

85. Plaintiff and the Class will continue to spend significant amounts of time to monitor their financial accounts for misuse.

86. The theft of Social Security Numbers, which were purloined as part of the Data Breach, is particularly detrimental to victims. The U.S. Social Security Administration ("SSA") warns that "[i]dentity theft is one of the fastest growing crimes in America."[30] The SSA has stated that "[i]dentity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought."[31] In short, "[s]omeone illegally using your Social Security number and assuming your identity can cause a lot of problems."[32]

87. In fact, a new Social Security number is substantially less effective where "other personal information, such as [the victim's] name and address, remains the same" and for some victims, "a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under your new number may make it more difficult for you to get credit."[33]

88. Identity thieves can use the victim's Private Information to commit any number of frauds, such as obtaining a job, procuring housing, or even giving false information to police during an arrest. Private Information can be used to submit false insurance claims. As a result, Plaintiff and Class members now face a real and continuing immediate risk of identity theft and other problems associated with the disclosure of their Social Security numbers, and will need to monitor their credit for an indefinite duration. For Plaintiff and Class members, this risk creates unending

30 *Identity Theft And Your Social Security Number*, SOCIAL SECURITY ADMIN. (Dec. 2013), http://www.ssa.gov/pubs/EN-05-10064.pdf.

[31] *Id.*

[32] *Id.*

[33] *Id.*

feelings of fear and annoyance. Private information is especially valuable to identity thieves. Defendants knew or should have known this and strengthened their data systems accordingly. Defendants was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

89. As a result of the Data Breach, Plaintiff and Class members' Private Information has diminished in value.

90. The Private Information belonging to Plaintiff and Class members is private, private in nature, and was left inadequately protected by Defendants who did not obtain Plaintiff's or Class members' consent to disclose such Private Information to any other person as required by applicable law and industry standards. Defendants disclosed information about Plaintiff and the class that was of an extremely personal, sensitive nature as a direct result of their inadequate security measures.

91. The Data Breach was a direct and proximate result of Defendant's failure to (a) properly safeguard and protect Plaintiff's and Class members' Private Information from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class members' Private Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

92. Defendants had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite their obligation to protect customer data.

93. Defendants did not properly train their employees to identify and avoid unauthorized access to the network.

94. Had Defendants remedied the deficiencies in their data security systems and adopted security measures recommended by experts in the field, they would have prevented the intrusions into their systems and, ultimately, the theft of Plaintiff's and Class members' Private Information.

95. As a direct and proximate result of Defendant's wrongful actions and inactions, Plaintiff and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

96. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, twenty-nine percent spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[34]

97. Other than offering two years of credit monitoring, Defendants did not take any measures to assist Plaintiff and Class members other than telling them to simply do the following:

- remain vigilant for incidents of fraud and identity theft;
- review account statements and monitor credit reports for unauthorized activity;
- obtain a copy of free credit reports;
- contact the FTC and/or the state Attorney General's office;
- enact a security freeze on credit files; and

[34] *See* U.S. Dep't of Justice, *Victims of Identity Theft,* OFFICE OF JUSTICE PROGRAMS: BUREAU OF JUSTICE STATISTICS 1 (Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf [hereinafter *Victims of Identity Theft*].

- create a fraud alert.

None of these recommendations, however, require Defendants to expend any effort to protect Plaintiff's and Class members' Private Information.

98. Defendant's failure to adequately protect Plaintiff's and Class members' Private Information has resulted in Plaintiff and Class members having to undertake these tasks, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money–while Defendants sit by and does nothing to assist those affected by the incident. Instead, as Defendants' Data Breach Notice indicates, it is putting the burden on Plaintiff and Class members to discover possible fraudulent activity and identity theft.

99. While Defendants offered two years of credit monitoring, Plaintiff could not trust a company that had already breached her data. The credit monitoring offered from Experian does not guarantee privacy or data security for Plaintiff, who would have to expose her information once more to get monitoring services. Thus, to mitigate harm, Plaintiff and Class members are now burdened with indefinite monitoring and vigilance of their accounts.

100. Moreover, the offer of two years of identity monitoring to Plaintiff and Class members is woefully inadequate. While some harm has already begun, the worst may be yet to come. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is acquired and when it is used. Furthermore, identity monitoring only alerts someone to the fact that they have already been the victim of identity theft (i.e., fraudulent acquisition and use of another person's Private Information) – it does not prevent

identity theft.[35] This is especially true for many kinds of financial identity theft, for which most credit monitoring plans provide little or no monitoring or protection.

101. Plaintiff and Class members have been damaged in several other ways as well. Plaintiff and Class members have been exposed to an impending, imminent, and ongoing increased risk of fraud, identity theft, and other misuse of their Private Information. Plaintiff and Class members must now and indefinitely closely monitor their financial and other accounts to guard against fraud. This is a burdensome and time-consuming activity. Plaintiff and Class members also suffered a loss of the inherent value of their Private Information.

102. The Private Information stolen in the Data Breach can be misused on their own, or can be combined with personal information from other sources such as publicly available information, social media, etc. to create a package of information capable of being used to commit further identity theft. Thieves can also use the stolen Private Information to send spear-phishing emails to Plaintiff and Class members to defraud them into revealing sensitive information. Lulled by a false sense of trust and familiarity from a seemingly valid sender (for example Wells Fargo, Amazon, or a government entity), the individual agrees to provide sensitive information requested in the email, such as login credentials, account numbers, and the like.

103. As a result of Defendant's failures to prevent the Data Breach, Plaintiff and Class members have suffered, will suffer, and are at increased risk of suffering:

- The compromise, publication, theft and/or unauthorized use of their Private Information;
- Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

[35] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, CNBC (Nov. 30, 2017), https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-beworth-the-cost.html.

- Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;
- The continued risk to their Private Information, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fails to undertake appropriate measures to protect the Private Information in their possession;
- Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class members; and
- Anxiety and distress resulting from fear of misuse of their Private Information.

104. In addition to a remedy for the economic harm, Plaintiff and Class members maintain an undeniable interest in ensuring that their Private Information remains secure and is not subject to further misappropriation and theft.

## **<u>CLASS ACTION ALLEGATIONS</u>**

105. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

106. Plaintiff brings this action individually and on behalf of all other persons similarly situated (the "Class") pursuant to Federal Rule of Civil Procedure 23.

107. Plaintiff proposes the following Class definition subject to amendment based on information obtained through discovery. Notwithstanding, at this time, Plaintiff brings this action and seeks certification of the following Nationwide Class and Pennsylvania Subclass (collectively defined herein as the "Class"):

**Nationwide Class**

> All persons nationwide whose Private Information was compromised as a result of the Data Breach and who were sent notice of the Data Breach.

**Pennsylvania Subclass**

> All citizens of Pennsylvania whose Private Information was compromised as a result of the Data Breach and who were sent notice of the Data Breach.

Excluded from the Class are Defendants and Defendants' affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

108. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

109. **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that joinder of all Class members would be impracticable. On information and belief, the Nationwide Class numbers in the thousands.

110. **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual members of the Class. Such common questions of law or fact include, *inter alia*:

- Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

- Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

- Whether Defendants properly implemented their purported security measures to protect Plaintiff's and the Class's Private Information from unauthorized capture, dissemination, and misuse;

- Whether Defendants took reasonable measures to determine the extent of the Data Breach after it first learned of same;

- Whether Defendants disclosed Plaintiff's and the Class's Private Information in violation of the understanding that the Private Information was being disclosed in confidence and should be maintained;

- Whether Defendants willfully, recklessly, or negligently failed to maintain and execute reasonable procedures designed to prevent unauthorized access to Plaintiff's and the Class's Private Information;

- Whether Defendants were negligent in failing to properly secure and protect Plaintiff's and the Class's Private Information;

- Whether Defendants were unjustly enriched by their actions; and

- Whether Plaintiff and the other members of the Class are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief.

111. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and other members of the Class. Similar or identical common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

112. **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, all Class members were similarly injured through Defendant's uniform misconduct described above and

were thus all subject to the Data Breach alleged herein. Further, there are no defenses available to Defendants that are unique to Plaintiff.

113. **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Nationwide Class because her interests do not conflict with the interests of the Classes she seeks to represent, she has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and her counsel.

114. **Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23 (b)(2).

115. **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct. Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

**COUNT I**
**Negligence**
**(On Behalf of Plaintiff and the Nationwide Class)**

116. Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

117. Upon Defendants' accepting and storing the Private Information of Plaintiff and the Class in their computer systems and on their networks, Defendants undertook and owed a duty to Plaintiff and the Class to exercise reasonable care to secure and safeguard that information and to use commercially reasonable methods to do so. Defendants knew that the Private Information was private and confidential and should be protected as private and confidential.

118. Defendants owed a duty of care not to subject Plaintiff's and the Class's Private Information to an unreasonable risk of exposure and theft because Plaintiff and the Class were foreseeable and probable victims of any inadequate security practices.

119. Defendants owed numerous duties to Plaintiff and the Class, including the following:

- to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Private Information in their possession;
- to protect Private Information using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and
- to implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

120. Defendants also breached their duty to Plaintiff and Class members to adequately protect and safeguard Private Information by disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to

unsecured Private Information. Furthering their dilatory practices, Defendants failed to provide adequate supervision and oversight of the Private Information with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted a malicious third party to gather Plaintiff's and Class members' Private Information and potentially misuse the Private Information and intentionally disclose it to others without consent.

121. Defendants knew, or should have known, of the risks inherent in collecting and storing Private Information and the importance of adequate security. Defendants knew or should have known about numerous well-publicized data breaches.

122. Defendants knew, or should have known, that their data systems and networks did not adequately safeguard Plaintiff's and Class members' Private Information.

123. Defendants breached their duties to Plaintiff and Class members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff and Class members' Private Information.

124. Because Defendants knew that a breach of their systems would damage thousands of their customers, including Plaintiff and Class members, Defendants had a duty to adequately protect their data systems and the Private Information contained thereon.

125. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and their customers, which is recognized by laws and regulations including but not limited to common law. Defendants were in a position to ensure that their systems, and the systems of their affiliates, were sufficient to protect against the foreseeable risk of harm to Class members from a data breach.

126. In addition, Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . .

practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

127. Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

128. Defendants' own conduct also created a foreseeable risk of harm to Plaintiff and Class members and their Private Information. Defendant's misconduct included failing to: (1) secure Plaintiff's and Class member's Private Information; (2) comply with industry standard security practices; (3) implement adequate system and event monitoring; and (4) implement the systems, policies, and procedures necessary to prevent this type of data breach.

129. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Class members' Private Information, by failing to ensure their affiliates used such measures, and by failing to provide timely notice of the Data Breach. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

- Failing to adopt, implement, and maintain adequate security measures to safeguard Class members' Private Information;
- Failing to adequately monitor the security of Defendant's networks and systems;
- Allowing unauthorized access to Class members' Private Information;
- Failing to detect in a timely manner that Class members' Private Information had been compromised; and
-

- Failing to timely notify Class members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages

130. Through Defendant's acts and omissions described in this Complaint, including their failure to provide adequate security and failure to protect Plaintiff's and Class members' Private Information from being foreseeably captured, accessed, disseminated, stolen and misused, Defendants unlawfully breached their duty to use reasonable care to adequately protect and secure Plaintiff's and Class members' Private Information during the time it was within Defendants' possession or control.

131. Defendant's conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to failing to adequately protect the Private Information and failing to provide Plaintiff and Class members with timely notice that their sensitive Private Information had been compromised.

132. Neither Plaintiff nor the other Class members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

133. As a direct and proximate cause of Defendant's conduct, Plaintiff and Class members suffered damages as alleged above.

134. Plaintiff and Class members are also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide lifetime free credit monitoring to all Class members.

**COUNT II**
**Breach of Contract**
**(On Behalf of Plaintiff and the Nationwide Class, against Orrstown only)**

135. Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

136. Plaintiff and Class members entered into valid and enforceable express contracts with Orrstown under which Plaintiff and other Class members agreed to provide their Private Information to Orrstown, and Orrstown agreed to provide financial services and, impliedly, if not explicitly, agreed to protect Plaintiff's and Class members' Private Information.

137. To the extent Orrstown's obligation to protect Plaintiff's and other Class members' Private Information was not explicit in those express contracts, the express contracts included implied terms requiring Defendants to implement data security adequate to safeguard and protect the confidentiality of Plaintiff's and other Class members' Private Information, including in accordance with trade regulations; federal, state and local laws; and industry standards. No Plaintiff would have entered into these contracts with Orrstown without understanding that Plaintiff's and other Class members' Private Information would be safeguarded and protected; stated otherwise, data security was an essential implied term of the parties' express contracts.

138. A meeting of the minds occurred, as Plaintiff and other Class members agreed, among other things, to provide their Private Information in exchange for Orrstown's agreement to protect the confidentiality of that Private Information.

139. The protection of Plaintiff and Class members' Private Information was a material aspects of Plaintiff's and Class members' contracts with Orrstown.

140. Orrstown's promises and representations described above relating to industry practices, and about Orrstown's purported concern about their clients' privacy rights became terms of the contracts between Orrstown and their clients, including Plaintiff and other Class members. Orrstown breached these promises by failing to comply with reasonable industry practices.

141. Plaintiff and Class members read, reviewed, and/or relied on statements made by or provided by Orrstown and/or otherwise understood that Orrstown would protect their customers' Private Information if that information were provided to Orrstown.

142. Plaintiff and Class members fully performed their obligations under the implied contract with Defendant; however, Orrstown did not.

143. As a result of Orrstown's breach of these terms, Plaintiff and other Class members have suffered a variety of damages including but not limited to: the lost value of their privacy; they did not get the benefit of their bargain with Defendant; they lost the difference in the value of the secure services Defendants promised and the insecure services received; the value of the lost time and effort required to mitigate the actual and potential impact of the Data Breach on their lives, including, inter alia, that required to place "freezes" and "alerts" with credit reporting agencies, to contact financial institutions, to close or modify financial accounts, to closely review and monitor credit reports and various accounts for unauthorized activity, and to file police reports; and Plaintiff and Class members have been put at increased risk of future identity theft, fraud, and/or misuse of their Private Information, which may take years to manifest, discover, and detect.

144. Plaintiff and Class members are therefore entitled to damages, including restitution and unjust enrichment, disgorgement, declaratory and injunctive relief, and attorney fees, costs, and expenses.

## COUNT III
## Breach of Implied Contract
## (On Behalf of Plaintiff and the Nationwide Class against Orrstown only)

145. Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

146. Plaintiff brings this claim for breach of implied contract alternatively to her breach of contract claim.

147. Through their course of conduct, Orrstown, Plaintiff, and Class members entered into implied contracts for the provision of financial services, as well as implied contracts for the Defendants to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class members' Private Information.

148. Specifically, Plaintiff entered into a valid and enforceable implied contract with Defendants when she first entered into the financial services agreement with Orrstown.

149. The valid and enforceable implied contracts to provide financial services that Plaintiff and Class members entered into with Orrstown include Orrstown's promise to protect nonpublic Private Information given to Orrstown or that Orrstown creates on their own from disclosure.

150. When Plaintiff and Class members provided their Private Information to Orrstown in exchange for Orrstown's services, they entered into implied contracts with Orrstown pursuant to which Orrstown agreed to reasonably protect such information.

151. Orrstown solicited and invited Class members to provide their Private Information as part of Orrstown's regular business practices. Plaintiff and Class members accepted Orrstown's offers and provided their Private Information to Orrstown.

152. In entering into such implied contracts, Plaintiff and Class members reasonably believed and expected that Orrstown's data security practices complied with relevant laws and regulations, and were consistent with industry standards.

153. Class members who paid money to Orrstown reasonably believed and expected that Orrstown would use part of those funds to obtain adequate data security. Orrstown failed to do so.

154. Under implied contracts, Orrstown and/or their affiliated providers promised and were obligated to: (a) provide financial services to Plaintiff and Class members; and (b) protect Plaintiff's and the Class members' Private Information provided to obtain such benefits of such services. In exchange, Plaintiff and Members of the Class agreed to pay money for these services, and to turn over their Private Information.

155. Both the provision of financial services and the protection of Plaintiff's and Class members' Private Information were material aspects of these implied contracts.

156. The implied contracts for the provision of financial services—contracts that include the contractual obligations to maintain the privacy of Plaintiff's and Class members' Private Information—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Orrstown's Data Breach notification letter.

157. Orrstown's express representations, including, but not limited to the express representations found in their Privacy Notice, memorializes and embodies the implied contractual obligation requiring Defendants to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class members Private Information.

158. Consumers of financial services value their privacy, the privacy of their dependents, and the ability to keep their Private Information associated with obtaining such services. Plaintiff and Class members would not have entrusted their Private Information to Orrstown and entered into these implied contracts with Orrstown without an understanding that their Private Information would be safeguarded and protected or entrusted their Private Information to Orrstown in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

159. A meeting of the minds occurred, as Plaintiff and Class members agreed and provided their Private Information to Orrstown and/or their affiliated companies, and paid for the provided services in exchange for, amongst other things, both the provision of financial services and the protection of their Private Information.

160. Plaintiff and Class members performed their obligations under the contract when they paid for Defendant's services and provided their Private Information.

161. Orrstown materially breached their contractual obligation to protect the nonpublic Private Information Defendants gathered when the information was accessed and exfiltrated by the Data Breach.

162. Orrstown materially breached the terms of the implied contracts, including, but not limited to, the terms stated in the relevant Notice of Privacy Practices. Defendants did not maintain the privacy of Plaintiff's and Class members' Private Information as evidenced by their notifications of the Data Breach to Plaintiff and Class members. Specifically, Defendants did not comply with industry standards, standards of conduct embodied in statutes like Section 5 of the FTCA, or otherwise protect Plaintiff's and Class members' private information as set forth above.

163. The Data Breach was a reasonably foreseeable consequence of Orrstown's action in breach of these contracts.

164. As a result of Orrstown's failure to fulfill the data security protections promised in these contracts, Plaintiff and Class members did not receive full benefit of the bargain, and instead received financial and other services that were of a diminished value to that described in the contracts. Plaintiff and Class members therefore were damaged in an amount at least equal to the difference in the value of the lending services with data security protection they paid for and the services they received.

165. Had Orrstown disclosed that their security was inadequate or that it did not adhere to industry-standard security measures, neither the Plaintiff, Class members, nor any reasonable person would have utilized services from Defendants and/or their affiliated entities.

166. As a direct and proximate result of the Data Breach, Plaintiff and Class members have been harmed and suffered, and will continue to suffer, actual damages and injuries, including without limitation the release and disclosure of their Private Information, the loss of control of their Private Information, the imminent risk of suffering additional damages in the future, out of pocket expenses, and the loss of the benefit of the bargain they had struck with Defendant.

167. Plaintiff and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

168. Plaintiff and Class members are also entitled to injunctive relief requiring Orrstown to, *e.g.,* (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class members.

**COUNT IV**
**Unjust Enrichment/Quasi-Contract**
**(On Behalf of Plaintiff and the Nationwide Class)**

169. Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

170. Plaintiff and Class members conferred a monetary benefit on Defendants. Specifically, they purchased goods and services from Defendants and provided Defendants with their Private Information. In exchange, Plaintiff and Class members should have received from Defendants the goods and services that were the subject of the transaction and should have been entitled to have Defendants protect their Private Information with adequate data security.

171. Defendants knew that Plaintiff and Class members conferred a benefit on them and accepted or retained that benefit. Defendants profited from Plaintiff's and Class members' purchases and used Plaintiff's and Class members' Private Information for business purposes.

172. Defendants failed to secure Plaintiff and Class members' Private Information and, therefore, did not provide full compensation for the benefit the Plaintiff and Class members' Private Information provided.

173. Defendants acquired the Private Information through inequitable means as they failed to disclose the inadequate security practices previously alleged.

174. If Plaintiff and Class members knew that Defendants would not secure their Private Information using adequate security, they would not have used Defendant's services.

175. Plaintiff and Class members have no adequate remedy at law.

176. Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiff and Class members conferred on them.

177. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and the Class members overpaid for the use of Defendant's services.

**COUNT V**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Nationwide Class)**

178. Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

179. In providing their Private Information to Defendants, Plaintiff and Class members justifiably placed a special confidence in Defendants to act in good faith and with due regard to

interests of Plaintiff and Class members to safeguard and keep confidential that Private Information.

180. Defendants accepted the special confidence Plaintiff and Class members placed in it.

181. In light of the special relationship between Defendants and Plaintiff and Class members, whereby Defendants became a guardian of Plaintiff's and Class members' Private Information, Defendants became a fiduciary by their undertaking and guardianship of the Private Information, to act primarily for the benefit of their customers, including Plaintiff and Class members for the safeguarding of Plaintiff and Class members' Private Information.

182. Defendants have a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of their customer's relationship, in particular, to keep secure the Private Information of their customers.

183. Defendants breached their fiduciary duties to Plaintiff and Class members by failing to protect the integrity of the systems containing Plaintiff's and Class member's Private Information.

184. Defendants breached their fiduciary duties to Plaintiff and Class members by otherwise failing to safeguard Plaintiff's and Class members' Private Information.

185. As a direct and proximate result of Defendant's breaches of their fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate

the actual and future consequences of the Cyber-Attack and Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as a result of the Cyber-Attack and Data Breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of Defendant's services they received.

186. As a direct and proximate result of Defendant's breaches of their fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## COUNT VI
**Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 Pa. Stat. §§ 201-1 to 201-9.2 ("UTPCPL"))**
**(On Behalf of Plaintiff and the Pennsylvania Subclass)**

187.. Plaintiff realleges and incorporates by reference all preceding allegations as if fully set forth herein.

188. Plaintiff and Defendants are each a "person" as defined in 73 Pa. Stat. § 201-2(2).

189. Plaintiff and the Pennsylvania Subclass members purchased goods and services in "trade" and "commerce" as defined by 73 Pa. Stat. §§ 201-2(3).

190. Plaintiff and the Pennsylvania Subclass purchased goods and services primarily for personal, family, and/or household purposes under 73 Pa. Stat. § 201-9.2.

191. Defendants engaged in "unfair methods of competition" or "unfair or deceptive acts or practices" as defined in 73 Pa. Stat. § 201-2(4) by engaging in the following conduct:

a. Representing that their goods and services had characteristics, uses, benefits, and qualities that they did not have—namely that their goods, services, and business practices were accompanied by adequate data security (73 Pa. Stat. § 201-2(4)(v));

b. Representing that their goods and services were of a particular standard or quality when they were of another quality (73 Pa. Stat. § 201-2(4)(vii));

c. Representing that their goods and services were of a particular standard or quality when they were of another quality (73 Pa. Stat. § 201-2(4)(ix)); and

d. "engaging in any other . . . deceptive conduct which creates a likelihood of confusion or misunderstanding" (73 Pa. Stat. § 201-2(4)(xxi)).

192. These unfair methods of competition and unfair or deceptive acts or practices are declared unlawful by 73 Pa. Stat. § 201-3.

193. Defendant's unfair or deceptive acts and practices include but are not limited to: failing to implement and maintain reasonable data security measures to protect client information; failing to identify foreseeable data security risks and remediate the identified risks; failing to comply with common law duties, industry standards including PCI DSS, and FTC guidance regarding data security; misrepresenting in their Privacy Policies that they would protect client data; and omitting and concealing the material fact that they did not have reasonable measures in place to safeguard client data.

194. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security practices and ability to protect PII.

195. Defendants intended to mislead consumers and induce them to rely on their misrepresentations and omissions. As set forth herein, Plaintiff did rely on Defendant's misrepresentations and omissions relating to their data privacy and security.

196. Plaintiff and Pennsylvania Subclass members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered with reasonable diligence.

197. Had Defendants disclosed to consumers that their data security systems were not secure and, thus, were vulnerable to attack, Plaintiff and Pennsylvania Subclass members would not have given their financial information to Defendant.

198. Defendants acted intentionally, knowingly, and maliciously in violating the Pennsylvania UTPCPL, and recklessly disregarded consumers' rights.

199. Past payment card data breaches put Defendants on notice of the importance of data security and that their card processing system was subject to attack.

200. As a direct and proximate result of Defendant's unfair methods of competition and unfair or deceptive acts or practices, Plaintiff and the Pennsylvania Subclass have suffered and will continue to suffer damages, injury, ascertainable losses of money or property, and monetary and non-monetary damages as described above.

201. Plaintiff and Pennsylvania Subclass members seek all monetary and non-monetary relief allowed by law, including the following as expressly permitted under 73 Pa. Stat. § 201-9.2:

a. "actual damages or [statutory damages of] one hundred dollars ($100), whichever is greater";

b. treble damages, defined as "three times the actual damages";

c. "reasonable attorney fees" and litigation costs; and d. "such additional relief as [the Court] deems necessary or proper."

202. Plaintiff and Pennsylvania Subclass members also seek the injunctive relief as set forth above and throughout this Complaint.

**COUNT VII**
**Declaratory Relief**
**(On Behalf of Plaintiff and the Nationwide Class)**

203. Plaintiff realleges and incorporates by reference all preceding allegations as if fully set forth herein.

204. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

205. An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class members' PII, and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class members from future data breaches that compromise their Private Information. Plaintiff and the Class remain at imminent risk that further compromises of their PII will occur in the future.

206. The Court should also issue prospective injunctive relief requiring Defendants to employ adequate security practices consistent with law and industry standards to protect consumers' PII.

207. Defendants still possess the PII of Plaintiff and the Class.

208. To Plaintiff's knowledge, Defendants have made no changes to their data storage or security practices relating to the PII.

209. To Plaintiff's knowledge, Defendants has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

210. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach. The risk of another such breach is real, immediate, and substantial.

211. The hardship to Plaintiff and Class members if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Among other things, if another data breach occurs, Plaintiff and Class members will likely continue to be subjected to fraud, identity theft, and other harms described herein. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

212. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the additional injuries that would result to Plaintiff and Class members, along with other consumers whose PII would be further compromised.

213. Pursuant to their authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Defendants must implement and maintain reasonable security measures, including but not limited to the following:

- Engaging third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration

tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

- engaging third-party security auditors and internal personnel to run automated security monitoring;
- auditing, testing, and training their security personnel regarding any new or modified procedures;
- purging, deleting, and destroying Private Information not necessary for their provisions of services in a reasonably secure manner;
- conducting regular database scans and security checks; and
- routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in favor of Plaintiff and the Class and against Defendants, as follows:

A. For an Order certifying this action as a class action and appointing Plaintiff and her counsel to represent the Class;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class members' Private Information, and from failing to issue prompt, complete and accurate disclosures to Plaintiff and Class members;

C. For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII compromised during the Data Breach;

D. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained by Defendants as a result of their wrongful conduct;

E. Ordering Defendants to pay for no less than three (3) years of credit monitoring services for Plaintiff and the Class;

F. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G. For an award of punitive damages, as allowable by law;

H. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

I. Pre- and post-judgment interest on any amounts awarded; and

J. Such other and further relief as this court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Date: July 2, 2026

Respectfully submitted,

Gary S. Graifman
**KANTROWITZ, GOLDHAMER, GRAIFMAN, PERLMUTTER & CARBALLO, P.C.**
135 Chestnut Ridge Road, Suite 200
Montvale, NJ 07645
Tel: (201) 391-7000
Fax: (201) 307-1086
ggraifman@kgglaw.com

Nicholas A. Migliaccio (pro hac vice anticipated)
*nmigliaccio@classlawdc.com*
Jason S. Rathod (pro hac vice anticipated)
*jrathod@classlawdc.com*
**Migliaccio & Rathod LLP**
412 H Street NE
Washington, DC 20002
Tel: (202) 470-3520
Fax: (202) 800-2730

***Counsel for Plaintiff***